UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ELIS NELSON ORTIZ-NIEVES,

                Petitioner,

                            Case No. 1:23-cv-2

v.

                            Honorable Robert J. Jonker

ADAM DOUGLAS,

                Respondent.

_____/

**<u>OPINION</u>**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Elis Nelson Ortiz-Nieves is incarcerated with the Michigan Department of Corrections at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. On December 7, 2017, following a four-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree child abuse, in violation of Mich. Comp. Laws § 750.136b(2), and first-degree felony murder, in violation of Mich. Comp. Laws § 750.316(1)(b). On January 11, 2018, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to life imprisonment without parole for the murder conviction and 80 to 150 years' imprisonment for first-degree child abuse.

On January 2, 2023, Petitioner filed his habeas corpus petition raising twenty-three grounds for relief. (Pet., ECF No. 1, PageID.2–5.) Respondent contends that Petitioner's grounds for relief are meritless. (ECF No. 13.)[1] Upon review and applying the standards of the Antiterrorism and

---

[1] Respondent also contends that Petitioner has procedurally defaulted several of his grounds for habeas relief. (ECF No. 13, PageID.1293.) However, a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), the Court agrees. Because Petitioner has failed to set forth a meritorious federal ground for habeas relief, the Court will deny his petition for writ of habeas corpus.

## <u>Discussion</u>

## I.    Factual Background

This case arises from the death of the minor victim, G, the son of Petitioner's girlfriend, Sonja Hernandez. *People v. Ortiz-Nieves*, 2019 WL 6247828, at *1 (Mich. Ct. App. Nov. 21, 2019). Following a four-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree child abuse, in violation of Mich. Comp. Laws § 750.136b(2), and first-degree felony murder, in violation of Mich. Comp. Laws § 750.316(1)(b).

Evidence presented at trial revealed that, at the time of his death, G was four years old. (Dec. 5, 2017, Tr., ECF No. 9-8, PageID.263.) In the month prior to his death, G was not in school and would be cared for by Petitioner or a babysitter while Ms. Hernandez, his mother, was at work. (*Id.*, PageID.274–75.)

Ms. Hernandez's other children testified about Petitioner's physical abuse toward them, their mother, and their brother, G.[2] Specifically, Ms. Hernandez's seven-year-old daughter, "B",

---

courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claim.

[2] Ms. Hernandez testified that Petitioner did not abuse her and that she never saw Petitioner abuse her children. (*Id.*, PageID.278–79.) However, in addition to the testimony provided by the children,

testified that, prior to G's death, Petitioner struck her in the leg with an extension cord, making marks on her leg, hit her with a belt on her bottom, and hit her with a sandal on her belly. (*Id.*, PageID.287.) She explained that, around the time of G's death, she saw similar marks of a sandal on G's belly as if Petitioner had also hit him. (*Id.*, PageID.287–88.) B testified that she witnessed Petitioner burn G with a cigarette on G's finger, hit G with a belt on his bottom, and put G in a cold shower. (*Id.*, PageID.288.) She also heard G screaming when he was in another room with Petitioner. (*Id.*, PageID.288.)

"A," Ms. Hernandez's eleven-year-old daughter, testified that, prior to his death, G showed A bruises on his stomach and "most of his body," including a bruise that looked as if it had been made with the bottom of a shoe, and that G's stomach was bruised and swollen near the time that he died. (*Id.*, PageID.291.) G also showed A bruises on his legs on a day G had stayed home with Petitioner. (*Id.*, PageID.292.) While A never personally saw Petitioner hurt G, she explained that she saw Petitioner carry G into "the back" of the home and then could hear "a belt hitting . . . a bunch of times," and that Ms. Hernandez told Petitioner to "whoop G one time," and Petitioner did. (*Id.*) A also witnessed Petitioner hit B with an extension cord and drag B from the kitchen to her room. (*Id.*)

---

the prosecution impeached Ms. Hernandez with a May 22, 2017, text exchange with Petitioner in which she told Petitioner to "[w]hoop [G's] a**" after Petitioner reported that G had an accident on Ms. Hernandez and Petitioner's bed. (*Id.*, PageID.278–79.) Petitioner texted back that he was not "whooping him," but admitted that he was going to make G take a cold shower as punishment. (*Id.*, PageID.279.) Ms. Hernandez was also confronted with evidence showing that Petitioner had apologized for hitting Ms. Hernadez with an object that caused an injury to Ms. Hernandez's finger, (*id.*, PageID.279), and autopsy photographs of G plainly depicting multiple injuries, (*id.*, PageID.280). Ms. Hernandez subsequently pleaded guilty to two counts of perjury in violation of Mich. Comp. Laws § 750.422. Register of Actions, *People v. Hernandez*, Case No. 18-01316-FC, https://www.accesskent.com/CNSearch/appstart.action (select Criminal Case Search, enter First Name "Sonja," Last Name "Hernandez," and Year of Birth "1988," complete reCAPTCHA, select Search Criminal Cases; select Case Number, 18-01316-FC) (last accessed Nov. 30, 2024).

Ms. Hernandez's ten-year-old son, "D," testified that Petitioner or Ms. Hernandez would hit him "most of the days of the week." (*Id.*, PageID.300.) D's testimony regarding Petitioner's abuse was substantiated by photographs taken by Jessica Cloutier, a Children's Protective Services Investigator responsible for investigating allegations of child and abuse and neglect, a few days after G's death. (*Id.*, PageID.284–85.) Ms. Cloutier's photographs depicted bruising and injuries, including an injury on D's leg (Exhibit 27) consistent with being struck with a half-circle shaped metal belt buckle. (*Id.*, PageID.2856–86, 299.)

D also testified that Petitioner "beat" G "every day" and, afterward, would put G in a "very, very, cold shower." (*Id.*, PageID.300, 302.) Prior to his death, G showed D marks on his chest and stomach where it appeared that Petitioner hit G with his sandal. (*Id.*) In the week before G died, D witnessed Petitioner hit G with a belt "all the way to the room. And like, [D] heard [G's] head bang up on the wall, because [Petitioner] threw him." (*Id.*, PageID.300.) During this time, D heard G begging Petitioner to stop. (*Id.*, PageID.301.) D also witnessed blisters on G's hand, (*id.*, PageID.302), and explained that G had once told D and his sisters that Petitioner had hit him in "his private part with a flashlight," causing him pain and bleeding, (*id.*, PageID.299.) D explained that, after Petitioner would hurt G, Petitioner would put G in a cold shower in his clothes. (*Id.*, PageID.301.)

When other people would ask Petitioner what happened to G, Petitioner would blame D (*id.*, PageID.302), consistent with Petitioner's theory of defense presented at trial. Ms. Hernandez's children described that Ms. Hernandez had told them to lie to police and Child Protective Services workers about what was happening within the home. (*Id.*, PageID.289, 292–93, 304.)

On the day prior to G's death, Ms. Hernandez, Petitioner, their collective children, and Petitioner's goddaughter were together at the home. (*Id.*, PageID.275.) Ms. Hernandez left for work the following morning for her 6:30 a.m. shift while everyone else was sleeping. (*Id.*, PageID.276.) At that time, G was in one bedroom, D, his brother, was in another bedroom, and Petitioner was with the girls in the living room. (*Id.*, PageID.276, 290–91.) When the girls awoke, A served the girls some cereal and Petitioner sent the girls outside. (*Id.*, PageID.291.) D heard Petitioner say, "come on, boy" and shut the door to his bedroom, followed by slapping noises "[l]ike fist hitting, like skin," and G crying. (*Id.*, PageID.296–97.) While in his bedroom, D heard G was saying, "I'm sorry. I'm sorry. I'm sorry." (*Id.*) The next thing D heard was the shower turn on and Petitioner tell G he could get in the shower. (*Id.*) Petitioner went outside and came back in, at which time Petitioner entered the room where D was located and said, "Come help me." (*Id.*) Petitioner put G on a towel on the kitchen floor and began CPR while D went across the street to call the ambulance. (*Id.*)

When Deputy Jack Wood of the Kent County Sheriff's Department arrived at the home and saw medical personnel getting their equipment; he heard yelling and ran inside. (*Id.*, PageID.266.) Deputy Wood saw a young child lying on the ground and Petitioner performing CPR in a panicked, aggressive manner, with compressions to the child's distended stomach. (*Id.*, PageID.268, 270.) Petitioner told Deputy Wood that he had been feeding G bacon and G was drinking a lot of water, but also told Deputy Wood that the child had a shower and wasn't breathing right when he came out. (*Id.*, PageID.268–69.) Deputy Wood noted that G had a distended stomach and bruising and blotching all over his body. (*Id.*, PageID.268–70.) Responding officers heard Petitioner repeatedly saying, "It was all my fault." (*Id.*, PageID.268–70, 272.) G was taken to the hospital, while Petitioner was questioned by police.

While Petitioner was interviewed by police, officers learned that G's stomach was filled with blood, not water, and, eventually, that G had died. (*Id.*, PageID.361.) Because of the information that officers learned from the hospital, police became aware during their questioning of Petitioner that G died from a significant injury caused by blunt force with "pretty immediate onset." (*Id.*, PageID.363.)[3]

Dr. Alan Start, a forensic pathologist and medical examiner for Kent County, performed the autopsy of G. (*Id.*, PageID. 366.) Dr. Start found multiple significant and notable external injuries to G's head, torso, extremities, and back, some with patterns consistent with the testimony provided by G's siblings, including injuries to G's leg consistent with being struck with an elongated object, an injury to G's ear, a scar to the knee consistent with a belt buckle strike, circular injuries to the upper thigh and hand consistent with burn marks, an injury to the lower right thigh consistent with a belt buckle strike, an injury to G's penis, parallel contusions to the right knee, an injury to the tip of the finger, seven narrow contusions to the scalp that could be indicative of being punched, injuries to the face and head, and fractures of the ribs at different stages of healing, which based on G's age, would have required significant blunt force trauma to the back. (*Id.*, PageID.366–71.) Dr. Start testified that the most significant injuries were contusions to the abdomen that correlated to the internal injuries. (*Id.*)

Dr. Start explained that G's abdomen contained a large amount of blood and, from the nature of the injuries to G's abdomen, could tell that they were caused by a blunt force impact to the abdomen. (*Id.*) Dr. Start testified that the injuries "would be recent bruises, having occurred at

---

[3] It is apparent from the trial transcripts that the jury was shown a shortened video of Petitioner's interview by police, admitted as Exhibit 5 by stipulation, including statements by Petitioner to police (*see id.*, PageID.361); however, the Court was not provided with a copy of that recording.

about the time of death or shortly before death," and found other significant injuries, including multiple injuries to G's upper, mid, and lower back, that would be very unusual locations for accidental injuries and could not have been caused by CPR. (*Id.*, PageID.368.) Dr. Start also found evidence of a subdural hematoma that indicated both an old injury and one that occurred shortly before death. (*Id.*, PageID.370.) The type and number of injuries led Dr. Start to conclude that G had multiple assaultive injuries that were not accidental. (*Id.*, PageID.370.)

Dr. Start testified that the injury that caused G's death was significant as it was done with the type of force that Dr. Start would typically see in motor vehicle accidents, consistent with one or multiple forceful blows to the abdomen by an adult. (*Id.*, PageID.371.) He explained to the jury that, once G's abdomen became bloated, the injury had already occurred. (*Id.*) There was also no evidence of bacon in G's stomach. (*Id.*) Dr. Start concluded that G's death was a homicide caused by blunt force trauma to the abdomen. (*Id.*, PageID.373.)

Dr. James Henry, Director of Children's Trauma Assessment Center, testified as an expert for the prosecution over the objection of defense counsel. (Dec. 7, 2017, Tr., ECF No. 9-12, PageID.403.) He testified that it is common for children who have lived in a traumatic environment to lie to protect their abusers even if it is in their best interests to tell the truth, that it is typical for children to delay disclosures, that children will often not even communicate to one another about the abuse because abuse is wrapped in secrecy and fear, and that it is common for children who are victims of abuse to soil or urinate themselves. (*Id.*, PageID.403–04.)

At the conclusion of the prosecution's case, the defense made a motion for a directed verdict, claiming insufficient evidence. (*Id.*, PageID.405.) In denying the motion, the trial court explained:

> We have a - - unfortunately, a situation here where we're dealing with the death of
> a four-year-old child. The evidence from the medical examiner clearly showed that

this child was severely abused from his head to his toe. There were numerous injuries of varying ages. There were broken ribs. There were burn marks over the child's body. There were all kinds of bruises, scrapes, abrasions, and what the doctor testified to was with regards to the injury that killed him, were several blows to the stomach that he said took a force that was significant to or comparable to an automobile accident. And unfortunately, there was - - the intestines were ripped and the mesentery which holds them and supplies the blood was broken, and this child died as a result of a homicide, according to the medical examiner and that is uncontested at this time, from any evidence.

There was testimony from three of the siblings. That testimony is extremely compelling. There was a seven-year-old, a ten-year-old and an 11-year-old that testified about the abuse that they had seen and observed from the defendant. And the ten-year-old specifically stated that just prior to this incident this child went unconscious, he heard the defendant in a room with the victim and heard a slapping, like - - and he said it was similar to what you would hear when someone was hitting someone with a fist or a hand. I think the evidence is more than sufficient to survive a motion for a directed verdict. The directed verdict is denied.

(*Id.*, PageID.405.)

Petitioner went on to testify at trial regarding his relationship with G and that he did not

notice any marks or bruises on G's body. (*Id.*, PageID.406–07, 381–87.)

Jury deliberations began at 12:16 p.m. and the trial court reconvened with a guilty verdict

at 1:41 p.m. (*Id.*, PageID.400.) On January 11, 2018, the trial court sentenced Petitioner as a fourth

felony offender to life in prison without the possibility of parole for felony murder, with a

concurrent sentence of 80 to 150 years for child abuse in the first degree. (Jan. 11, 2018, Tr., ECF

No. 9-13, PageID.408, 415–16.)

On December 5, 2018, the parties appeared for Petitioner's motion to recuse, motion for a

*Ginther* hearing,[4] motion for a new trial, motion for expert witness fees, and motion to produce

evidence. (Dec. 5, 2018, Tr., ECF No. 9-14, PageID.418.) With respect to Petitioner's claim of a

---

[4]A hearing under *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973) allows a criminal defendant to proffer facts or evidence in support of a claim of ineffective assistance of counsel. *Ceasor v. Ocwieja*, 655 F. App'x 263, 266, 271 (6th Cir. 2016).

*Brady* violation, defense counsel acknowledged that the parties were aware of the existence of slides because the medical examiner's report referenced them. (*Id.*, PageID.422.) In denying Petitioner's motion, the trial court further noted that no one had made any request for the slides in discovery and there was nothing "intentional" about any non-disclosure. (*Id.*, PageID.422–24.) The trial court also denied Petitioner's motion for expert fees. (*Id.*, PageID.425.) As to Petitioner's request for a *Ginther* hearing, the trial court observed that the attorney representing Petitioner at trial "did an excellent job in a very difficult case," and denied the motion. (*Id.*, PageID.426.)

Petitioner, with the assistance of counsel, directly appealed his convictions to the Michigan Court of Appeals. The Michigan Court of Appeals denied relief on November 19, 2019. *People v. Ortiz-Nieves*, No. 342256, 2019 WL 6247828 (Mich. Ct. App. Nov. 21, 2019). Petitioner then filed an application for leave to appeal to the Michigan Supreme Court. That supreme court denied leave by order entered April 29, 2020. *People v. Ortiz-Nieves*, 941 N.W.2d 640 (Mich. 2020).

Thereafter, Petitioner returned to the trial court. The Kent County Circuit Court docket shows that Petitioner filed one motion for relief from judgment on December 14, 2020. (Kent Cnty. Cir. Ct. Register of Actions, ECF No. 9-1, PageID.47–48.) In his motion, Petitioner requested that the trial court appoint a "postappeal defense attorney," hold a *Batson* hearing to determine if the jury pool was drawn from a fair cross section of the community, hold a *Remmer* hearing to determine if the conduct of a juror had an effect on the remaining jurors, hold a *Moody* evidentiary hearing to determine whether witnesses testified falsely, hold a *Washington/Flowers* hearing to determine whether the trial court should have issued a warrant for a witness and to determine whether missing witness testimony would have been exculpatory, hold a *Ginther/Maples* hearing to determine whether counsel was ineffective, and award various types of relief based upon Petitioner's conviction. (Motion for Relief from Judgment, ECF No. 9-15, PageID.428.) The trial

9

court denied Petitioner's motion for relief from judgment on January 13, 2021. (Ord., ECF No. 9-
16, PageID.452–55.)

The Kent County Circuit Court docket also indicates that Petitioner filed a second motion
for relief from judgment on June 2, 2021. (Kent Cnty. Cir. Ct. Register of Actions, ECF No. 9-1,
PageID.47.) That motion was denied on June 4, 2021. (*Id*.)

On May 10, 2021, Petitioner filed an application for leave to appeal the trial court's January
13, 2021, order denying his first motion for relief from judgment to the Michigan Court of Appeals.
(Appl. for Leave to Appeal, ECF No. 9-20, PageID.1087–1131.) The Michigan Court of Appeals
denied leave by order entered July 26, 2021. (Mich. Ct. App. Order, ECF No. 9-20, PageID.1086.)
Petitioner then sought leave to appeal to the Michigan Supreme Court. (Appl. for Leave to Appeal,
ECF No. 9-21, PageID.1186–1242.) The Michigan Supreme Court denied leave to appeal by order
entered May 3, 2022. *People v. Ortiz-Nieves*, 973 N.W.2d 134 (Mich. 2022).

After the Michigan Supreme Court denied leave to appeal the decision denying Petitioner's
post-judgment motion, Petitioner filed a habeas corpus petition in the United States District Court
for the Eastern District of Michigan. *See Ortiz-Nieves v. Macauley*, No. 2:22-cv-12065, 2022 WL
4280293, at *1 (E.D. Mich. Sept. 15, 2022). The Eastern District of Michigan court dismissed the
petition without prejudice because Petitioner failed to identify "which, if any, of the grounds for
relief he raised in the state courts are the basis for his prayer for habeas corpus relief" and "he
provide[d] no supporting facts for any of the listed grounds." *Id*. at *2. The court reminded
Petitioner that his request for habeas relief was subject to a statute of limitations and that several
months had already run on the limitations period. *Id*. The court also noted, however, that Petitioner
was represented by counsel and that several months still remained to file a proper habeas petition.
*Id*. The court explained to Petitioner that when he filed a proper petition, he should file it in the

United States District Court for the Western District of Michigan, where venue was proper. *Id*. at *3.

On January 2, 2023, Petitioner filed his habeas corpus petition raising twenty-three grounds for relief, as follows:

I.     Trial counsel was ineffective for failing to call several material witnesses who would have provided exculpatory testimony, and for failing to introduce certain exculpatory evidence.

II.    Trial counsel was ineffective for failing to present expert testimony to rebut the prosecutor's expert witness.

III.   Trial counsel was ineffective for failing to effectively cross-examine the prosecutor's expert witness.

IV.    Trial counsel was ineffective for failing to effectively cross-examine the complainant's sibling.

V.     Trial counsel was ineffective for failing to present an independent medical examination report and recommendation.

VI.    The prosecution violated *Brady vs. Maryland*, 474 US 83 (1963) by failing to provide complete hospital records, microscopic slides, x-rays, hospital admission records, and a pathology report essential for impeachment purposes.

VII.   The trial court abused its discretion by admitting the testimony of the prosecution's expert witness because the testimony 'was based on junk science' and was highly prejudicial.

VIII.  The trial court abused its discretion by admitting evidence of Petitioner's past episodes of domestic violence and violence toward children pursuant to MRE 404(b).

IX.    The Petitioner was unconstitutionally denied a fundamentally fair state proceeding when the bindover occurred with the prosecution having failed to establish by probable cause beyond the corpus delicti of felony murder independent of his statements to the police.

X.     The Petitioner was unconstitutionally denied a fundamentally fair state proceeding when the bindover occurred with the prosecution having failed to establish by probable cause the corpus delicti of child abuse first-degree independent of his statements to the police.

XI.   The Petitioner was unconstitutionally denied a fundamentally fair state court proceeding when he was found guilty of felony murder and child abuse first degree when the great weight of the evidence failed to establish beyond a reasonable doubt the corpus delecti of felony murder and child abuse first degree beyond his statements to police.

XII.   The Petitioner was unconstitutionally denied a fundamentally fair state court proceeding because there is a strong showing that he is factually innocent of felony murder and child abuse first-degree where the only evidence presented was the petitioner's statements to law enforcement and the corpus delecti rule was violated because the conviction was based entirely on the petitioner's statements.

XIII.   The Petitioner was denied a fundamentally fair state court proceeding when the trial court abused its discretion by refusing to address the Petitioner's Batson challenge and timely objection to preemptory challenges related to the racial composition of the venire.

XIV.   The Petitioner was unconstitutionally denied a fundamentally fair trial when, over his objection, the trial court ab[us]ed its discretion by admitting exhibits 27-49.

XV.   The Petitioner was unconstitutionally denied a fundamentally fair trial when, over his objection, the trial court ab[us]ed its discretion by admitting exhibits 32, 35 and 41.

XVI.   The Petitioner was unconstitutionally denied a fundamentally fair trial when the trial court abused its discretion by refusing to hold a Remmer hearing to determine whether one juror's misconduct caused other juror(s) to be unfairly biased against the Petitioner.

XVII.   The Petitioner was unconstitutionally denied a fundamentally fair trial when his felony murder and child abuse first-degree convictions are substantially based on materially false testimony by the prosecutor's child witness expert, [D].

XVIII.   [Petitioner skips from habeas ground XVII to habeas ground XIX in the petition.]

XIX.   The Petitioner was unconstitutionally denied a fundamentally fair state court proceeding when the trial court abused its discretion by refusing to issue a subpoena or material witness detainer to produce child [therapist], Christopher Curry, at trial to provide testimony as a defense witness.

XX.   The Petitioner was unconstitutionally denied a fund[a]mentally fair state court proceeding when the trial court abused its discretion by denying the defense motion for a direct[ed] verdict when the evidence [considered] in [a] light most favorable to the people did not raise an issue for the jury.

XXI.   The Petitioner was unconstitutionally denied a fundamentally fair state court proceeding where the verdict of guilty as to felony murder and child abuse first-degree was against the great weight of the evidence.

XXII.   The Petitioner was unconstitutionally denied a fundamentally fair state court sentencing hearing when the court imposed an excessively severe and disparate custodial term of 80 to 150 years for child abuse first-degree an invalid sentence pursuant to MCR 6.508(d)(3)(a)(b)(iv).

XXIII. The Petitioner was unconstitutionally denied effective assistance of counsel when trial counsel failed to fully preserve the constitutional violations set forth in this petition.

XXIV. The Petitioner was constitutionally denied effective assistance of appellate counsel when appellate counsel failed to raise in the state court or on appeal the issues set forth in this petition.

(Pet., ECF No. 1, PageID.2–5.)

On March 23, 2023, the Court ordered Respondent to file an answer to the petition. On September 19, 2023, Respondent moved to dismiss the petition as untimely. Petitioner responded on October 5, 2023. The Court denied Respondent's motion on October 16, 2023. (ECF No. 12.) Respondent then filed a supplemental answer to the petition on February 13, 2024. (ECF No. 13.) The petition is now ripe for review.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28

U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

14

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example,

15

if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Ineffective Assistance of Counsel – Grounds I–V

In his first five grounds for habeas relief, Petitioner claims that he was deprived of effective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights. (ECF No. 1, PageID.2, 7.) In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. State of La.*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Petitioner contends that trial counsel was ineffective for failing to call several material witnesses who Petitioner believes would have presented exculpatory testimony, failing to

16

introduce exculpatory evidence, failing to present rebuttal expert testimony, failing to effectively cross examine the prosecution's expert witness, failing to effectively cross-examine siblings, and failing to present an independent medical report and recommendation. (Pet., ECF No. 1, PageID.2.) Petitioner itemizes his grounds for habeas relief in a cursory fashion only, failing to further elaborate as to the bases for his legal claims. However, it is apparent from the record that Petitioner's claims are misguided and disregard the deference to the state court's determinations that the AEDPA requires. Petitioner presented each of the foregoing arguments to the state courts on direct appeal, where they were rejected as meritless. *Ortiz-Nieves*, 2019 WL 6247828, at *2–4. This Court finds Petitioner's claims to be meritless as well.

In addressing Petitioner's claims of ineffective assistance of counsel on direct appeal, the Michigan Court of Appeals explained: "This Court reviews de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and whether, without the error, the result of the proceedings would have been different." *Ortiz-Nieves*, 2019 WL 6247828, at *1 (quoting *People v. McFarlane*, 926 N.W.2d 339, 352 (Mich. Ct. App. 2018)). While the state court relied upon Michigan case law, the standard cited is functionally identical to *Strickland*.

Because the Michigan Court of Appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusions regarding Petitioner's ineffective assistance claims are an unreasonable application of *Strickland* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d). As explained below, Petitioner fails to carry his burden.

### 1.    Failure to Call Witnesses – Ground I

On direct appeal, Petitioner claimed that trial counsel was ineffective for "failing to secure witnesses who would have negated the argument that the [Petitioner] assaulted the child the day

the child died." (Appellate Br., ECF No. 9-18, PageID.692.) Petitioner identified the following witnesses who he claims should have been called to testify: G's grandmother, Nora Villareal-Mulero, neighbors Melissa Avalos and Sandra Carpenter, "the children's first therapist," Lewanda Vaughn, and former co-workers of Ms. Hernandez. (*Id.*, PageID.693–97.) He also identified Sonja Hernandez, who in fact did testify at trial. (*Id.*, PageID.694.) Petitioner claimed that these witnesses would have supported the defense theory of the case that G was hurt by D, his brother. (*Id.*, PageID.693–697.) Petitioner provided a single affidavit from Ms. Avalos.

While decisions as to what evidence to present and whether to call certain witnesses are presumed to be a matter of trial strategy, the failure to call witnesses or present other evidence may constitute ineffective assistance when it deprives a petitioner of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). In rejecting Petitioner's first claim of ineffective assistance of counsel, the Michigan Court of Appeals offered a detailed explanation as follows:

> First, defendant argues that G's grandmother, if testifying truthfully, would have testified that D had been expelled from school for property destruction and violent behavior, and that D's issues preceded defendant's involvement with the family. We see no reason why this proffered testimony would have made any difference at trial, as trial counsel was able to elicit Hernandez's admission that D had been expelled from school, and had previous physical altercations with G. Moreover, because she was unwilling to cooperate with appellate counsel, there is no factual predicate in the record beyond appellate counsel's own self-serving affidavit for concluding that the grandmother's testimony would have been helpful to the defense. See *People v. Hoag*, 460 Mich. 1, 6; 594 N.W.2d 57 (1999) (the defendant has the burden to establish the factual predicate for a claim of ineffective assistance of counsel).

> Second, defendant submits an affidavit from Melissa Avalos, defendant's neighbor, in which she states that she often observed D hit G and, on one occasion, when she asked D why he did that, D responded, "I can hit him if I want to, my Dad said he is not my brother; he is a bastard child and I can kill him." Avalos further stated that D hit other children, had a reputation for violence, his school had suspended him for fighting, A had told Avalos that she believed D killed G, and trial counsel never contacted her, even though she requested that he do so, and confronted him concerning his lack of contact at the courthouse.

18

Because defendant acknowledges that trial counsel was fully aware of Avalos, we can presume that trial counsel's decision not to call her as a witness amounted to trial strategy. See *People v. Dixon*, 263 Mich. App. 393, 398; 688 N.W.2d 308 (2004) ("[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, which we will not second-guess with the benefit of hindsight.") (quotation marks and citation omitted). In any event, as the prosecution argues, other trial witnesses already provided testimony as to D's history of violence, which was not in dispute. Likewise, Avalos's testimony concerning the alleged statements of D and A was inadmissible hearsay. And A's purported "belief" was not relevant, especially given that she testified at trial that she did not see who injured G. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." MRE 602. There is no reason to conclude that this proposed testimony would have changed the outcome at trial. See *Chapo*, 283 Mich. App. at 371

Third, defendant argues that trial counsel should have called Hernandez as a defense witness because, if she had testified truthfully, she would have testified that pictures of G taken close to his death show him without any bodily marks or bruises, and that a video existed documenting G stating that D hit him. Defendant fails to acknowledge that Hernandez did, in fact, testify at trial, and admitted that D had anger issues, and a history of violence toward his brother. Additional evidence pointing to D's anger issues and history of violence would have been merely cumulative. Moreover, because the forensic pathologist testified that G's fatal injury likely occurred only minutes before the 911 call, the photographs were not likely to change the outcome of trial. See *Chapo*, 283 Mich. App. at 371.

Fourth, defendant raises the possibility that the children's therapist could have testified that that he believed that the children were "coached" by their biological father, and the therapist's testimony would have impeached the children's testimony about defendant's abusive conduct. However, this proposed testimony would have been largely inadmissible. Under MRE 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." As explained by our Supreme Court, "[u]nder ordinary circumstances a witness is to be restricted to facts within his personal knowledge, and his opinion or conclusion with respect to matters in issue, or relevant to the issue, may not be received in evidence." *Dudek v. Popp*, 373 Mich. 300, 305; 129 N.W.2d 393 (1964). This rule obviates "[t]he danger involved in receiving the opinion of a witness . . . that the jury may substitute such opinion for their own." See *id.* at 305-306. Moreover, "to prevent the routine disclosures that would undermine therapeutic relationships," what a patient tells to a therapist is considered privileged. *People v. Stanaway*, 446 Mich. 643, 678; 521 N.W.2d 557 (1994). Although the privilege is not absolute, defendant does not provide any legal argument for piercing the privilege under these circumstances. Therefore, we conclude that defendant insufficiently briefed this argument, and we decline to consider it. See *People v. Williams*, 228 Mich. App. 546, 558; 580

N.W.2d 438 (1998) ("a party may not announce a position and leave it to [this Court] to discover and rationalize the basis for the claim.").

Fifth, defendant suggests that two additional witnesses, Lewanda Vaughn and Sandra Carpenter, could also have testified that D acted violently toward G, and likely could have caused his fatal injury. Again, because trial counsel already presented evidence to this effect at trial, we conclude that there was no probability of the trial concluding differently had either of these witnesses testified. See *Chapo*, 283 Mich. App. at 371.

*Ortiz-Nieves*, 2019 WL 6247828, at *2–3 (footnote omitted).

Petitioner offers no evidence whatsoever, much less clear and convincing evidence, to overcome the presumption of correctness afforded to the factual determinations by the court of appeals. *See* 28 U.S.C. § 2254(e)(1). Petitioner's conclusory allegations about what the witnesses would have said at trial to support his claim of ineffective assistance of counsel, without evidentiary support, provide no basis for habeas relief. *See Workman v Bell*, 178 F.3d 759, 771 (6th Cir. 1998). Therefore, Petitioner's failure to provide the Michigan Court of Appeals, as well as this Court, with affidavits from the majority of these witnesses precludes relief. The Court further finds that the court of appeals reasonably concluded that the testimony that was provided by affidavit—and even the speculative testimony that was not—does not support Petitioner's claim of ineffective assistance of counsel. Accordingly, Petitioner is not entitled to habeas relief on this ground.

## 2.    Failure to Present Expert Testimony to Rebut the Prosecutor's Expert Witness – Ground II

On appeal, Petitioner next claimed that trial counsel was ineffective for failing to present expert testimony to counter the testimony by the prosecution's expert, Dr. Henry. (ECF No. 9-18, PageID.698.) Petitioner specifically pointed to Dr. Katherine Jacobs (nee Okla), who had previously testified on behalf of a defendant in rebuttal to Dr. Henry. (*Id.*) Petitioner claimed that

Dr Jacobs "would have testified that Dr. Henry's opinion was not based in science and that it would not meet the requirements of *Daubert, supra.*" (*Id.*)

Petitioner does not offer an affidavit or report from Dr. Jacobs regarding the nature of her proposed testimony. Instead, he looks to *People v. Zacharko*, 2015 WL 9318566 (Mich. Ct. App. Dec. 22, 2015), a case that pitted prosecution expert Dr. Henry against defense expert Dr. Jacobs. Based on that case, Petitioner suggests that Dr. Jacobs could have kept Dr. Henry off the stand altogether under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or at least challenged the scientific foundations of Dr. Henry's opinions based on Dr. Jacobs's offered testimony in the *Zacharko* case. Because Dr. Henry testified, however, his testimony boosted the testimony of A, B, and D, "where they had all given several different versions of what happened, where they had all been interviewed several times and by many different people and where some even admitted to having lied to the police." (Pet'r's Mich. Ct. App. Br., ECF No. 9-18, PageID.699.)

The Michigan Court of Appeals rejected that argument, stating:

"An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *Payne*, 285 Mich App at 190. Moreover, "irrespective of whether defense counsel's decision concerning whether to retain independent experts was proper trial strategy," a defendant cannot obtain relief by merely speculating that "the retention of an independent expert would have altered the outcome of the lower court proceedings." *Id.* To that end, "effective counsel need not always provide 'an equal and opposite expert.'" *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018), quoting *Harrington v Richter*, 562 US 86, 111; 131 S Ct 770; 178 LEd2d 624 (2011).

Defendant acknowledges that he does not know whether an expert would have had any relevant testimony to provide, but he suggests that an evidentiary hearing could provide an opportunity "to gather testimony," and conduct further investigation. Defendant's speculation that a defense expert may have altered the outcome of his trial is not a basis for obtaining relief. *See Payne*, 285 Mich App at 190. Moreover, the record reveals that defense counsel strategically chose not to discredit Dr. James Henry, but rather to use his expertise—as the prosecution's witness—as a means of discrediting the testimonies of A, B, and D, each of which had been extremely damaging because those children separately testified that defendant had been

21

abusive to G. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *Carll*, 322 Mich at 702 (quotation marks and citation omitted). Defendant has not overcome the presumption that it was sound trial strategy to rely on the prosecution's expert witness as a means of discrediting damaging testimony from other witnesses.

*Ortiz-Nieves*, 2019 WL 6247828, at *3–4.

The state court's analysis tracks clearly established federal law. In another case where a criminal defendant argued his counsel was ineffective for failing to consult with or call Dr. Jacobs (then Okla), the Sixth Circuit Court of Appeals explained:

[Petitioner] first claims that his trial counsel was ineffective for failing to call Dr. Katherine Okla to testify or to consult with her about his case. We disagree. [Petitioner]'s trial counsel did not perform deficiently by failing to call Dr. Okla . . . .

According to [Petitioner], Dr. Okla's expert testimony was necessary to rebut the testimony of the State's forensic interviewer, Margo Moltmaker, whose expert testimony buttressed A.M.'s testimony at trial. "But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "[S]trategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, [594] U.S. [731], 141 S. Ct. 2405, 2410, 210 L.Ed.2d 812 (2021) (per curiam) (quoting *Richter*, 562 U.S. at 104, 131 S.Ct. 770). "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Richter*, 562 U.S. at 111, 131 S.Ct. 770.

That appears to be the approach trial counsel took in defending [Petitioner]. After Moltmaker took the stand, [Petitioner]'s trial counsel cross-examined her about the forensic protocols she employed—the precise topic Dr. Okla would allegedly have testified about . . . .

But that is not all. Counsel questioned Moltmaker about how children like A.M. might be manipulated by police or their guardians in these types of situations and made known that A.M. had spoken with a few relatives, the police, and a nurse prior to speaking with Moltmaker.

Lastly, counsel questioned Moltmaker about some seeming discrepancies in A.M.'s testimony based on the forensic interview notes . . . .

Trial counsel's cross-examination and recross-examination touched on most of what [Petitioner] alleges Dr. Okla would have testified to. . . . Considering all of this, we cannot say that counsel was constitutionally deficient for not calling Dr.

Okla to the stand. *See Richter*, 562 U.S. at 111, 131 S.Ct. 770 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."); *see also Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007) (noting that the decision to rely on cross-examination instead of opposing expert testimony "does not constitute ineffective assistance of counsel ... even if the wisdom of such an approach is debatable." (internal citations and quotation marks omitted)).

*McQueen v. Winn*, No. 19-2212, 2021 WL 3079699, at *5–6 (6th Cir. July 21, 2021) (footnotes omitted).[5]

Moreover, the court of appeals reasonably applied *Strickland*, *Richter*, and *Dunn*. Dr. Henry's testimony only took about 15 minutes. (Dec. 7, 2017, Transcript, ECF No. 9-12, PageID.402–405.) Dr. Henry's testimony, as solicited by the prosecutor, can be paraphrased as follows:

> For a variety of reasons, it is common for children who have lived in a traumatic environment to seemingly lie to protect their abuser even though it will be in their interest to tell a safe person what is going on.

> It is common for disclosure to be delayed because children are afraid, ashamed, and feel powerless.

> Disclosure is a process. A child may disclose a little bit at a time.

---

[5] Similarly, in *Brannon v. Rapelje*, 672 F. App'x 557 (6th Cir. 2016), another case where defense counsel chose to forego interviewing or calling Dr. Jacobs (then Okla), the Sixth Circuit Court of Appeals again found counsel's strategy to be reasonable:

> The state court's determination that foregoing expert testimony constituted a "reasonable strategic decision" is supported by federal law. The Supreme Court has recognized that counsel may sometimes forego key arguments when raising them could "increase[ ] the likelihood of the prosecution[ ] producing its own evidence . . . or transform the case into a battle of the experts." *Harrington*, 562 U.S. at 108–09, 131 S.Ct. 770. Indeed, because criminal cases impose such a high burden of proof on the prosecution, "it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Id.* at 109, 131 S.Ct. 770.

*Brannon*, 672 F. App'x at 561.

Abuse is wrapped in secrecy and fear. Often siblings will not communicate with each other about the abuse.

Abuse can negatively impact bladder control.

Abuse victims may describe the abuse with a flat affect that does not appear to match the significant trauma described.

Coached statements sound like a scripted narrative using adult words.

A person who abuses a child can be abusive one minute and caring and responsive at another time.

(*Id*.) On cross-examination, Petitioner's counsel focused on one aspect of Dr. Henry's testimony. Counsel confirmed that it would be uncommon for siblings to talk to each other about the abuse while the abuse was ongoing. (*Id*., PageID.405.)

Petitioner's counsel's strategy regarding Dr. Henry's testimony can be gleaned from closing argument. (Dec. 7, 2017, Transcript, ECF No. 9-11, PageID.393–395.) Counsel argued that Dr. Henry's testimony supported Petitioner's contention that the story that A, B, and D told at trial was coached. Counsel emphasized that the initial story that the children told the police was entirely consistent with Petitioner's report of the events. Only after months of coaching have the children told the "scripted" stories that the jurors heard, stories that, based on Dr. Henry's testimony, include suspect details like the children talking about the abuse among each other while the abuse was ongoing.

The fact that counsel's strategy did not succeed does not mean that counsel's decision to pursue it was unreasonable. Indeed, counsel did exactly what *Richter* suggests may be appropriate: "it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Richter*, 562 U.S. at 109. Ultimately, however, it is not the obligation of this Court to sort out whether counsel's strategy was reasonable.

When a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Richter*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "not whether counsel's actions were reasonable[; t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 562 U.S. at 102).

In *Richter*, the issue was whether counsel could have reasonably decided to not consult a blood expert. The *Richter* court did not evaluate counsel's decision based on the reasons offered by counsel. Indeed, it does not appear that there was ever a hearing that disclosed counsel's motivation for his decision. Instead, the *Richter* court considered the reasonableness of the decision in the abstract. That approach necessarily follows from *Strickland*'s requirement that, to overcome the presumption of regularity, the defendant must show that the challenged action ***cannot*** be considered sound trial strategy. If the reviewing court can conceive of a sound strategy that includes the challenged action, the matter is resolved.

The Court concludes that the Michigan Court of Appeals offered a reasonable argument that counsel satisfied *Strickland*'s deferential standard. Therefore, Petitioner has failed to show that the state court's determination is contrary to, or an unreasonable application of, clearly established federal law and he is not entitled to habeas relief on this claim.

### 3.    Failure to Adequately Cross-Examine Witnesses – Grounds III and IV

Petitioner contends that counsel was ineffective for failing to adequately cross-examine two witnesses: Dr. Henry and G's brother, D. Counsel's decisions regarding how to cross-examine

a witness are matters of trial strategy, which are entitled to "great respect" by this Court. *See Glenn v. Sowders*, No. 85-5754, 1986 WL 18475, at *4 (6th Cir. Dec. 8, 1986); *see also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."). While there may be room for improvement in cross-examination, were that to be "the standard of constitutional effectiveness, few would be the counsel whose performance [pass] muster." *Henderson*, 118 F.3d at 1287 (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)).

On direct appeal, the Michigan Court of Appeals addressed Petitioner's claim that counsel was ineffective in questioning Dr. Henry as follows:

> Although defense counsel's cross-examination of Dr. Henry was short, and did not actively seek to discredit his testimony, it is apparent from the record that defense counsel strategically chose not to discredit Dr. Henry, but rather to use his own expertise—and status as the prosecution's witness—as a means of discrediting the testimonies of A, B, and D. Unsuccessful trial strategy does not amount to ineffective assistance of counsel. *Carll*, 322 Mich. App. at 702 (quotation marks and citation omitted).

*Ortiz-Nieves*, 2019 WL 6247828, at *4.

The court of appeals also addressed Petitioner's claim that counsel was ineffective in his questioning of D:

> It is also argued that trial counsel's examination of D was ineffective because the defense theory focused on the possibility that D caused his brother's death, yet trial counsel did not aggressively cross-examine D. In support of this theory, defendant emphasizes the testimony of Hernandez and the other children, who all acknowledged that D often hurt G, and had a history of violence and anger issues. Defendant contends that more effective cross-examination of D "was essential to support the defense theory of the case." Defendant's argument is short and cursory, and does not suggest what questions went unasked, or how defense counsel should have differently approached this particular cross-examination. The argument is abandoned as inadequately briefed. *See, e.g.*, *People v. Martin*, 271 Mich. App. 280, 315; 721 N.W.2d 815 (2006). Even on the merits, we discern no error. "The questioning of witnesses is presumed to be a matter of trial strategy." *Petri*, 279 Mich. App. at 413. The prosecution argues that trial counsel's decision not to ask an ultimate question was both strategic and reasonable because it is rarely a wise decision to seek a murder confession on the witness stand, especially from a 10-

26

year-old child. We agree that trial counsel's strategy was reasonable, even if it did not achieve the intended objective. See *Carll*, 322 Mich. App. at 703.

*Ortiz-Nieves*, 2019 WL 6247828, at *4.

Petitioner offers no new argument regarding counsel's questioning or discussion of the court of appeals' conclusion in his § 2254 petition. He merely reiterates his arguments presented on direct appeal in a conclusory fashion.

Once again, the issue is not whether counsel's approach was the optimal approach; the issue is not even "whether counsel's actions were reasonable[,] *Richter*, 562 U.S. at 105; the issue is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard[,]" *Id*. Petitioner must show that the challenged action **cannot** be considered sound trial strategy. Anything short of that means that "there is [a] reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The court of appeals identified a strategic reason for counsel's approach to cross-examination. Petitioner must show that the court of appeals' identified strategy is unreasonable— that it cannot be considered sound. He has not. Therefore, Petitioner has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claim premised upon counsel's failure to adequately cross-examine Dr. Henry and D was contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief.

### 4.    Failure to Obtain an Independent Medical Examination Report and Recommendation – Ground V

Petitioner argues that trial counsel was ineffective for failing to obtain an independent medical exam to explain the injuries on G's body. To support his claim on appeal, Petitioner included an affidavit of Dr. Dragovic which questioned whether autopsy microscopic slides that were not reviewed by Dr. Dragovic could have contradicted the notion that the injuries sustained by G rendered him dead within a span of only a couple of hours. (ECF No. 9-18, PageID.771.)

However, Petitioner did not provide the court of appeals or this Court with any evidence that any independent expert witness would have in fact testified to a different explanation of G's injuries and cause of death.

In rejecting Petitioner's claim on direct appeal, the Michigan Court of Appeals similarly explained that Petitioner's "argument that an independent medical examination could have provided an alternative and nonincriminating explanation for the injuries on G's body is highly speculative." *Ortiz-Nieves*, 2019 WL 6247828, at *4. It noted that Petitioner argued only that an independent medical examination "could possibly have provided alternative explanations for the injuries on the child's body," and that trial counsel in fact consulted an independent expert, Dr. Daniel Spitz, who found nothing wrong with the findings of Dr. Start. *Id.* Finally, the court of appeals rejected Petitioner's claim as Petitioner offered no evidence to challenge Dr. Start's competency or findings but instead only speculation" and the "possibility" of an alternative explanation. *Id.*

It is well-settled that conclusory and speculative allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for federal habeas relief. *See Workman,* 178 F.3d at 771 (explaining that "Workman provides no support for this claim[; h]is allegation is merely conclusory"); *Fautenberry v. Mitchell*, 515 F.3d 614, 634 (6th Cir. 2008) (stating "Fautenberry has the burden of establishing his counsel's deficiency, and this speculative argument is insufficient to support an ineffective-assistance claim"); *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) (noting that "[i]n the absence of any evidence showing that they would have offered specific favorable testimony, Tinsley cannot show prejudice"). Petitioner offers this Court nothing to suggest that the decision by the court of appeals was objectively unreasonable. Therefore, Petitioner is not entitled to habeas relief.

### B.    *Brady* Violation – Ground VI

Petitioner contends that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence, including "complete hospital records, microscopic slides, x-rays, hospital admission records, and a pathology report essential for impeachment purposes." (ECF No. 1, PageID.2.) Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

On direct appeal, Petitioner argued that "the missing evidence" would have been in control of the county medical examiner and, therefore, the State, and that "[t]hey would be material and exculpatory in nature in that they would impeach Dr. Start's findings as to timing of injury, manner of death, manner of infliction of the fatal injury and possibly the identity of the perpetrator." (Pet. App. Br., ECF No. 9-18, PageID.708.) He also claimed that the microscopic slides "could be outcome changing." (*Id.*)

The Michigan Court of Appeals found that Petitioner's *Brady* argument "lack[ed] merit." *Ortiz-Nieves*, 2019 WL 6247828, at *5. "Defendant does not have a viable *Brady* argument simply by making a general assertion that records 'may contain evidence useful for impeachment on cross-examination,' because that could exist in every case." *Id.* (quoting *Stanaway*, 446 Mich. at 681). The record reveals that defense counsel was aware of these records at the time of trial and could have requested them but did not. Petitioner's assertion that these records "could be outcome changing" is nothing more than impermissible speculation, and does not support habeas relief.

29

### C.    Admission of Evidence– Grounds VII, VIII, XIV, and XV

In his habeas ground VII and VIII, Petitioner contends that the trial court "abused its discretion" by admitting inadmissible testimony, namely, the testimony of the prosecution's expert witness and Petitioner's past episodes of domestic violence and violence against children. (ECF No. 1, PageID.3.) Again, in ground XIV and XV, Petitioner contends that the trial court abused its discretion in admitting several exhibits. (*Id.*, PageID.4.) However, state courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68.

It is not inconceivable, however, that evidence properly admitted under state law might still have the effect of rendering Petitioner's trial unfair. State court evidentiary rulings, though, "cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach affords the state courts wide latitude for ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, a federal court may not grant relief if it would have decided the evidentiary question differently. A federal court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law, or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "'a Supreme Court case establishing a due process right with regard to the specific kind of evidence' at issue"). Petitioner has not met that burden.

### 1.    Admission of Expert Testimony – Ground VII

On direct appeal, Petitioner claimed that the trial court abused its discretion in admitting the testimony of Dr. Henry, the prosecution's expert witness, arguing that his testimony was based on "junk science" and, therefore, violated *Daubert* and Michigan Rule of Evidence 704. (ECF No. 9-18, PageID.712–13.) However, "[t]he admission of expert testimony in a state trial presents a question of state law which does not warrant federal habeas relief unless the evidence violates due process or some other federal constitutional right." *Randolph v. Wolfenbarger*, No. 04-CV-73475, 2006 WL 1662885, at \*5 (E.D. Mich. June 12, 2006) (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001)); *see also Adesiji v. Minnesota*, 854 F.2d 299, 300 (8th Cir. 1988) (whether expert testimony regarding general patterns of credibility among children reporting sexual abuse was properly admissible was "essentially a matter of state law"). "Similarly, a determination as to whether an individual is qualified to give expert testimony involves only a state law evidentiary issue." *Randolph*, 2006 WL 1662885, at \*5 (citing *United States ex. Rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 743 (N.D. Ill. 2002)).

31

Petitioner has not demonstrated that the admission of Dr. Henry's testimony deprived Petitioner of a fundamentally fair trial or otherwise violated clearly established federal law. The U.S. Supreme Court has adopted standards for the admission of expert testimony in *federal* trials as set forth in *Daubert,* 509 U.S. at 579, but it has never held that those standards are binding on the state courts under the constitution, *see Norris v. Schotten,* 146 F.3d 314, 335 (6th Cir. 1998). And Petitioner's additional argument that the trial court violated the Michigan Rules of Evidence lacks merit because "federal habeas corpus relief does not lie for errors of state law." *Lewis,* 497 U.S. at 780. Accordingly, the trial court's admission of Dr. Henry's testimony does not provide Petitioner with any basis for habeas relief.

## 2.    Admission of Past Episodes of Violence – Ground VIII

Petitioner claims that the trial court abused its discretion by admitting Petitioner's past episodes of domestic violence. However, the admission of this evidence is purely a matter of state law, not cognizable on habeas review. "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512 (6th Cir. 2003). As a result, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to' under AEDPA." *Id*. at 513 "[T]he threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis." *House v. Hatch*, 527 F.3d 1010, 1017 (10th Cir. 2008). Petitioner is therefore not entitled to relief on ground VIII.

## 3.    Admission of Exhibits – Grounds XIV and XV

In his grounds XIV and XV, Petitioner claims that he was denied a fair trial because the trial court admitted exhibits 27–49 and 32, 35, and 41 into evidence. In his motion for a directed verdict, Petitioner claimed that these exhibits were not necessary to establish any material fact in the case but were admitted to "incite passion and prejudice in the jury." (ECF No. 9-15,

PageID.445.) Petitioner asserts without further explanation that the outcome of the proceedings would have been different had these exhibits not been admitted. (*Id.*)

The U.S. Supreme Court has never ruled that the admission of crime scene or autopsy photographs violates due process. Rather, it has stated that just because a photograph "is shocking to the sensibilities of those in the courtroom" does not alone "render its reception a violation of due process." *Lisenba v. California*, 314 U.S. 219, 228 (1941). As a result, the Sixth Circuit has held that a challenge to the admission of a gruesome photo does not present a question of constitutional magnitude under clearly established Supreme Court law. *See Cooey v. Coyle*, 289 F.3d 882, 893–94 (6th Cir. 2002) (citing *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997)); *see also Franklin v. Bradshaw*, 695 F.3d 439, 456–57 (6th Cir. 2012) (admission of eighteen autopsy photographs of victims did not render state criminal trial fundamentally unfair); *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (affirming district court's denial of habeas relief on claim challenging the admission of victim photographs).

Moreover, "the Sixth Circuit repeatedly has held that a trial court's admission of gruesome photographs of a murdered victim does not violate the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries." *Mack v. Bradshaw*, No. 1:04-cv-829, 2021 WL 4477882, at *74 (N.D. Ohio Sept. 30, 2021) (citing *Biros*, 422 F.3d at 391). Here, the state court reasonably concluded that the photographs offered legitimate evidentiary value:

> Defendant argues autopsy photos of the victim should not have been admitted as evidence. According to Defendant, the photos were unduly prejudicial. However, the photos were clearly relevant as they showed the victim and his condition around the time of his death. They were also introduced to counter Defendant's defense that this may have been an accident. The Court already considered arguments regarding the photos prior to their admission and a determination was made that their probative value was not substantially outweighed by undue prejudice or other considerations. Defendant's conclusory claims of prejudice caused by the photos do not provide grounds for relief.

(Kent Cnty. Cir. Ct. Op. & Order, ECF No. 9-16, PageID.454.)

33

Given these circumstances, the Court finds that the state court's rejection of Petitioner's claim was reasonable and Petitioner is not entitled to habeas relief.

### D.    Failure to Establish Probable Cause – Grounds IX and X

In ground IX and X, Petitioner contends that he was denied a "fundamentally fair state proceeding" because the prosecution failed to establish probable cause at the time that Petitioner was bound over for trial. (ECF No. 1, PageID.3.) These claims are also not cognizable on habeas review.

Challenges to the propriety of initial proceedings in the state courts are not cognizable in federal habeas corpus proceedings because they do not undermine the validity of a conviction. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). Therefore, it is well-settled that a convicted defendant cannot upset a conviction on the argument that no probable cause was shown prior to conviction. *See United States v. Saussy*, 802 F.2d 849, 852 (6th Cir. 1986). Even the complete denial of a preliminary examination in the state system would not provide a basis for federal habeas corpus relief. *Dillard v. Bomar,* 342 F.2d 789, 790 (6th Cir.1965); *Scott v. Bock,* 241 F.Supp.2d 780, 793 (E.D. Mich. 2003). Therefore, Petitioner is not entitled to habeas relief on his grounds IX and X.

### E.    Verdict Against "the Great Weight of the Evidence" – Grounds XI and XXI

In ground X, Petitioner contends that he was deprived of a fair state court proceeding where "he was found guilty of felony murder and child abuse first degree when the great weight of the evidence failed to establish beyond a reasonable doubt the corpus delicti of felony murder and child abuse first-degree be[y]ond [Petitioner's] statements to police." (ECF No. 1, PageID.3.) Similarly, in ground XXI, Petitioner claims that he was deprived of a fair state court proceedings "where the verdict of guilty as to felony murder and child abuse first-degree was against the great weight of the evidence." (*Id.*, PageID.5.) These arguments are not cognizable on federal habeas review.

34

Michigan courts apply the great weight of the evidence standard to determine whether to grant a new trial. *See People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998). This question is distinct from the due process guarantee offended by insufficient evidence, *see Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007), and "does not implicate issues of a constitutional magnitude." *Id.* at 133 n.8. thus, a "weight of the evidence claim" is purely a matter of state law and is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (noting that "it is only noncompliance with federal law that renders a state's criminal judgment susceptible to a collateral attack in the federal courts); *Jerome v. Macauley*, No. 22-2136, 2023 WL 4058595, at *1 (6th Cir. May 22, 2023) (noting that "[a] claim that a petitioner's conviction is against the great weight of the evidence presents an issue of state law that is not cognizable on federal habeas review"). Petitioner, therefore, cannot establish that the state courts' rejection of his great weight of the evidence claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas grounds XI and XXI.

## F.    Actual Innocence – Ground XII

In ground XII, Petitioner contends that he was denied a fair trial because he was "factually innocent" and his conviction was based solely on his own admissions, without independent evidence. However, Petitioner's claim of actual innocence fails to state a cognizable federal claim. The Supreme Court has held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Although the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if

there were no state avenue open to process such a claim," this is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *Id.* at 417 ("We first point out the obvious - that this is not, in fact, a capital case.").

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*, which does not alone give rise to habeas relief.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit.

When framed as an argument of insufficient evidence, Petitioner's claim similarly fails. In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Witness credibility remains the province of the jury, *see Herrera*, 506 U.S. at 401–02 , and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

> [T]he sufficiency of the evidence review authorized by *Jackson* is limited to "record evidence." 443 U.S., at 318. *Jackson* does not extend to nonrecord evidence, including newly discovered evidence. Finally, the *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.

*Herrera*, 506 U.S. at 402.

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In denying Petitioner's motion for relief from judgment, the trial court addressed Petitioner's arguments that he is innocent and was convicted solely based upon his own admissions as follows:

> As for grounds 1 through 8, Defendant alleges a lack of *corpus delecti*, arguing that he is innocent and was convicted based only on his admissions without independent evidence to support it. This argument completely ignores the fact that Defendant had a four-year-old child in his care who was determined to have died by homicide as a result of a brutal beating. The homicide determination was based on examination of the victim's body. Defendant's statements admitting fault were just one part of a much larger picture. All of the elements of the crimes alleged were established by ample evidence independent of defendant's statements.

(Kent Cnty. Cir. Ct. Op. & Order, ECF No. 9-16, PageID.454.)

This Court agrees. An examination of the record evidence, particularly when viewed in a light most favorable to the prosecution, leaves no doubt that a reasonable trier of fact could have found Petitioner guilty. As a result, Petitioner is not entitled to relief.

### G.    *Batson* Challenge and Racial Composition of Jury Pool – Ground XIII

In his ground XIII, Petitioner alleges that he was denied a fair trial when the trial court refused to address Petitioner's *Batson* challenge and objection to the composition of the jury venire.

First, Petitioner never raised a *Batson* challenge in the proceedings below and has not done so here. While Petitioner referred to *Batson* in his motion for relief from judgment, his reference was merely misguided. (*See* ECF No. 9-15, PageID.437.)

In his motion for relief from judgment, Petitioner argued that he was denied a fair trial because the trail court refused to "hold a *Batson* evidentiary hearing to address Defendant's nonfrivolous objection to the racial make-up of his jury pool." (*Id.*) However, *Batson v. Kentucky*, 476 U.S. 79 (1986), concerned the analysis to be applied to an Equal Protection Clause claim that purposeful discrimination occurred in the selection of the petit jury based solely on the

prosecutor's exercise of his peremptory challenges at trial. *Id.* at 96. Petitioner's motion for relief from judgment did not discuss concerns regarding the prosecution's peremptory challenges, and Petitioner's concerns about the racial make-up of his jury pool do not implicate *Batson*. (*See* ECF No. 9-15, PageID.444.) Therefore, any claim that Petitioner seeks to raise under *Batson* has been procedurally defaulted.

Petitioner's remaining challenge to the racial composition of the jury pool is meritless. "The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). However, "defendants are not entitled to a jury of any particular composition[.]" *Garcia-Dorantes v. Warren*, 801 F.3d 584, 599 (6th Cir. 2015) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). "There is 'no requirement that the petit jury mirror the community and reflect the various distinctive groups in the population.'" *Id.* (quoting *Taylor*, 419 U.S. at 538). "The focus, therefore, is on the procedure for selecting juries, and not the outcome of that process." *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012). "[T]he composition of one panel does not indicate whether a fair cross-section claim exists." *Id.*

To show a violation of the fair-cross section requirement, a defendant must show (1) that the excluded group is a "distinctive" group in the community; (2) that the group's representation in the venires is unfair and unreasonable compared to its representation in the community; and (3) the underrepresentation is due to systematic exclusion in the jury-selection process. *United States v. Edmond*, 815 F.3d 1032, 1044 (6th Cir. 2016), *cert. granted, judgment vacated on other grounds sub nom. Harper v. United States*, 581 U.S. 912 (2017) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Here, Petitioner fails to present the Court with any argument, let alone evidence regarding the method of selecting jurors in Kent County or that the method of selection resulted in

the "systematic exclusion" of minority jurors. Petitioner's conclusory argument in ground XIII

does not demonstrate any entitlement to habeas relief.

###### H.    Refusal to Hold a *Remmer* Hearing on Juror Misconduct – Ground XVI.

In his motion for relief from judgment, Petitioner claimed that the trial court denied him a

fair trial by refusing to hold a *Remmer* hearing to determine if one juror's "misconduct" caused

other jurors to be biased against Petitioner. Specifically, Petitioner stated that the trial judge saw

that one juror was sleeping during the testimony of D and "[t]hat juror was then promptly

removed." (ECF No. 9-15, PageID.445.) He argued that "during deliberation, that sleeping juror

could have told one or more jurors that the defense is not worth paying attention to and they should

simply wait to find Defendant guilty regardless of the boring evidence." (*Id.*) Petitioner's

arguments are legally misguided and present nothing more than speculation.

First, regarding the sleeping juror, it is well-settled that sleeping during trial by a juror

constitutes misconduct. *United States v. Sherrill,* 388 F.3d 535, 537 (6th Cir. 2004). Criminal

defendants have a constitutional right to a fair trial and an impartial jury, *see Irvin v. Dowd,* 366

U.S. 717, 721 (1961), that is competent and unimpaired, *see Tanner v. United States,* 483 U.S.

107, 126–27 (1987). Therefore, a defendant could be deprived of the Fifth Amendment right to

due process or the Sixth Amendment right to an impartial jury if jurors fall asleep and are unable

to fairly consider the defendant's case. *See United States v. Freitag,* 230 F.3d 1019, 1023 (7th Cir.

2000). However, the sleeping juror could not have deprived Petitioner of either due process or an

impartial jury because this juror did not consider Petitioner's case. As Petitioner acknowledges,

the trial court acted to promptly remove the juror, who was then not part of any deliberations. *See*

*Freitag,* 230 F.3d at 1023 ("If sleep by a juror makes it impossible for that juror to perform his or

her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed

from the jury.")

Petitioner instead contends that the sleeping juror "could have" made an impression on other jurors, which may have included bias against Petitioner. Petitioner has presented the Court with absolutely no support for his speculation, instead contending that the trial court should have held a *Remmer* hearing. In discussing *Remmer v. United States*, 347 U.S. 227, (1954), the Sixth Circuit explained:

> In *Remmer*, the Supreme Court held that a prima facie showing of juror bias—such as an allegation of "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" in a criminal case—entitles a defendant to a hearing, awards to the defendant a presumption of prejudice, and places on the Government the burden of showing that the contact was harmless. *Remmer*, 347 U.S. at 229.

*Cunningham v. Shoop*, 23 F.4th 636, 648 (6th Cir.), *cert. denied,* 143 S. Ct. 37 (2022). However, in *Tanner,* 483 U.S. 107, the Supreme Court clarified that an evidentiary hearing delving into allegations of juror misconduct is required only where "extrinsic influence or relationships have tainted the deliberations." *Id.* at 120 (holding that a postverdict evidentiary hearing into allegations of drug and alcohol use by jurors during the trial was not required under the Sixth Amendment because "juror intoxication is not an 'outside influence' about which jurors may testify to impeach their verdict").

> A defendant must "do more than simply raise the possibility of bias" in order to obtain a full *Remmer* hearing. [*United States v. Owens,* 426 F.3d 800, 805 (6th Cir.2005) (quoting *Remmer v. United States,* 347 U.S. 227, 230 (1954)).] To the contrary, a trial court needs to conduct a *Remmer* hearing only when the defense raises a "colorable claim of extraneous influence." *Id.* (internal quotation and citation omitted).

*Jackson v. Bradshaw*, 681 F.3d 753, 766 (6th Cir. 2012). Here, Petitioner has not raised even an inference of bias or a showing of extrinsic influence as required to implicate *Remmer*. He also cites no authority for the proposition that bias should be presumed in the minds of all jurors because one excused juror dozed off. Petitioner's purely speculative claims regarding a *possibility* of bias do not entitle Petitioner to relief.

41

## I.    Materially False Testimony – Ground XVII.

Petitioner claims that he was denied a fair trial because "[t]here is a reasonable probability that [D] falsely testified against Defendant to shift the blame from [D] to Defendant, and that shows a significant possibility that Defendant is factually innocent . . ." (ECF No. 9-15, PageID.446.) However, as discussed above, Petitioner's claims of innocence do not entitle him to relief, and the presentation of perjured testimony by a witness, without more, does not rise to the level of a constitutional violation, *see Briscoe v. LaHue*, 460 U.S. 325, 327 (1983).

The Fourteenth Amendment right to due process instead prohibits a state from the knowing and deliberate use of perjured evidence in order to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). This claim encompasses use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false. *See Giglio v. United States*, 405 U.S. 150 (1972). "In order to establish prosecutorial misconduct for presenting false testimony, [petitioner] must show that (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew that it was false." *Roby v. Burt*, No. 17-2043, 2018 WL 1176512, at *4 (6th Cir. Feb. 14, 2018) (citing *Peoples v. Lafler*, 734 F.3d 503, 516 (6th Cir. 2013)). "'The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.'" *Id.* (quoting *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010)).

Here too, Petitioner alleges only that the testimony by D may have been false. He fails to provide this Court with any evidence to show that the testimony was "actually perjured" and, importantly, that the prosecutor knew or should have known that the testimony was false. Accordingly, Petitioner fails to meet his burden on ground XVII.

42

### J.    Refusal to Subpoena Child Therapist – Ground XIX

In his motion for relief from judgment, Petitioner argued that the children's therapist should have been subpoenaed to testify. He claims that the therapist would have testified that G's siblings had been coached by their father to testify falsely against Petitioner. (ECF No. 9-15, PageID.455.) This is similar to Petitioner's argument in ground I, alleging that trial counsel was ineffective for failing to call the children's therapist as a witness. As with ground I, Petitioner offers no factual support for this claim.

Petitioner's argument is based on nothing more than assumptions and speculation. Petitioner fails to point to any support within the record that the trial court was asked but refused to issue a subpoena for the children's therapist, that the therapist would have been available to testify, or that the children's therapist would have testified in the way that Petitioner contends. Petitioner bears the burden to justify relief on this claim, but he fails to make the required showing here. Therefore, this claim fails.

### K.    "Excessively Severe and Disparate" Sentence – Ground XXI

In ground XXI, Petitioner contends that his sentence of 80 to 150 years for child abuse in the first degree was unfair, in violation of the Michigan Court Rules, and "excessively severe and disparate." In support of his claim for relief in his motion for relief from judgment, Petitioner cited Michigan precedent holding that the "sentencing court must exercise discretion in choosing the type of **maximum** sentence to impose upon habitual offender and habitual offender refers to **minimum** sentence only." (ECF No. 9-15, PageID.440) (citing *People v. Ruffin*, 789 N.W.2d 173 (Mich. 2010), *overruled by People v. Brown*, 822 N.W.2d 208 (Mich. 2012)) (emphasis in original). Not only does this precedent run entirely counter to Petitioner's position, but it fails to provide Petitioner with any basis for relief.

The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67–68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *see Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief). Therefore, to the extent Petitioner claims that the trial court sentenced Petitioner in violation of the Michigan Court Rules, his claim is not cognizable on habeas review.

Moreover, to the extent Petitioner intends to suggest that his sentence was disproportionate under *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990), or unreasonable under *People v. Steanhouse*, 902 N.W.2d 327 (Mich. 2017), he fails to raise a cognizable habeas claim. In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). Nearly three decades later, in *Steanhouse*, the Michigan Supreme Court held that a sentencing court's departure from the sentencing guidelines is unreasonable if the court abused its discretion. *Steanhouse*, 902 N.W.2d at 335. The proper test for determining whether the sentencing court abused its discretion, it held, is found in *Milbourn*'s proportionality analysis. *Id.* In other words, a sentence departing from the guidelines is unreasonable if it is disproportionate. Clarifying its holding, the *Steanhouse* court expressly rejected adopting factors used by the federal courts. *Id.* It is plain that *Milbourn*, and thus *Steanhouse*, were decided under

state, not federal, principles, *see Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). As previously discussed, a federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. *See Wilson*, 562 U.S. at 5; *Bradshaw*, 546 U.S. at 76; *Pulley*, 465 U.S. at 41. Thus, any claim based on *Milbourn* and *Steanhouse* is not cognizable in a habeas corpus action.

Moreover, the Court will decline to consider any claim that Petitioner's sentence was disproportionate under the Eighth Amendment under the concurrent sentence doctrine.

The "concurrent sentence doctrine" invests a court with discretion to decline to hear a substantive challenge to a conviction when the sentence the petitioner is serving on the challenged conviction is concurrent with an equal or longer sentence on a valid conviction. *See United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992); *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989). The doctrine has its origins in appellate practice applicable to direct review of criminal cases. *See Benton v. Maryland*, 395 U.S. 784, 788–91 (1969); *Hirabayashi v. United States*, 320 U.S. 81 (1943). In these cases, the Supreme Court and the United States Court of Appeals for the Sixth Circuit have declined to review convictions on one count where the presence of a valid concurrent count is sufficient to retain the defendant in custody. *See, e.g., Hirabayashi*, 320 U.S. at 105; *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976). The standard guiding the court's discretion is whether there is any possibility of an adverse "collateral consequence" if the conviction is allowed to stand. *See Hughes*, 964 F.2d at 541; *Dale*, 878 F.2d at 935 n.3; *see also United States v. Byrd*, No. 89-6448, 1990 WL 116538, at *3 (6th Cir. Aug. 13, 1990); *United States v. Jackson*, No. 99-5889, 2000 WL 1290360, at *2 (6th Cir. Sept. 7, 2000); *United States v. Bell*, No. 95-6479, 1997 WL 63150, at *3 (6th Cir. Feb. 12, 1997).

Although the doctrine has its roots in direct appeals, federal courts apply it in habeas corpus actions, citing the futility of reviewing a conviction that will not result in a petitioner's release from custody. *See, e.g., Cranmer v. Chapleau*, No. 95-6508, 1996 WL 465025 (6th Cir. Aug. 13, 1996); *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991); *Williams v. Maggio*, 714 F.2d 554 (5th Cir. 1983); *VanGeldern v. Field*, 498 F.2d 400, 403 (9th Cir. 1974). The exercise of the court's discretion depends upon the degree of prejudice that may be attributed to the challenged conviction and, specifically, the effect of any adverse collateral consequence if the conviction is not overturned. *Williams*, 714 F.2d at 555. "'[A]dverse collateral consequences' such as 'delay of eligibility for parole, a harsher sentence under a recidivist statute for any future offense, credibility impeachment, and societal stigma[,]'" may be considered. *Buffin v. United States*, 513 F. App'x 441, 448 (6th Cir. 2013). In *Pillette v. Berghuis*, 408 F. App'x 873, 886 n.8 (6th Cir. 2010), the Sixth Circuit also included "an effect on . . . a potential pardon" and "the potential for use as evidence of a prior bad act" as additional adverse consequences. *Id*.

Such remote consequences, however, "are most salient on direct appeal, not on a collateral challenge." *Buffin,* 513 F. App'x at 448. The *Buffin* court pulled the list of collateral consequences from *United States v. DiCarlo*, 434 F.3d 447, 457 (6th Cir. 2006). The *DiCarlo* court, in turn, quoted the list from *Rutledge v. United States*, 517 U.S. 292, 301-02 (1996). The *Rutledge* Court derived the list of collateral consequences from *Benton v. Maryland*, 395 U.S. 784, 790-91 (1969), and *Sibron v. New York*, 392 U.S. 40, 54-56 (1968). *DiCarlo*, *Rutledge*, *Benton* and *Sibron* were direct appeals. Moreover, *Benton* and *Sibron* considered the existence of collateral consequences because absent such a consequence there would have been no justiciable controversy in those cases. The *Benton* Court noted that the fact that it could conceive of collateral consequences that might give rise to a justiciable controversy and permit the court to exercise jurisdiction did not

46

deprive the concurrent sentence doctrine of validity as a rule of judicial convenience. *Benton*, 395 U.S. at 791. The *Benton* Court simply chose not to apply it in that case. *Id*. at 792. *Rutledge* and *DiCarlo* (and the other cases cited in *DiCarlo*) are all double jeopardy cases where the existence of collateral consequences, no matter how slight, creates the multiple punishments barred by the Double Jeopardy Clause. Such slight or remote collateral consequences should not preclude application of the concurrent sentencing doctrine when jurisdictional and double jeopardy considerations are not at issue. If they did, the doctrine would simply disappear.

As noted above, in addition to his sentence of 80 to 150 years for child abuse in the first degree, Petitioner is imprisoned for life without the possibility of parole for his felony murder conviction. Ground XXI challenges only Petitioner's sentence for first degree child abuse. Even if the Court were to vacate Petitioner's sentence in that case, Petitioner would still be serving a life sentence. Thus, release from prison would not be available even if the sentence challenged were vacated. Moreover, given Petitioner's life sentence without the possibility of parole, Petitioner has not provided the Court with any indication that he would experience the sort of collateral consequences that counsel against application of the doctrine, nor can the Court discern any.

If the concurrent sentencing doctrine retains any vitality—and the Supreme Court and the United States Court of Appeals for the Sixth Circuit have indicated that it does—this is a case where it is appropriately applied. Accordingly, the Court will exercise its discretion and decline to consider any Eighth Amendment challenge that Petitioner may raise within respect to his sentence for first degree child abuse. Should Petitioner challenge his conviction for felony murder and succeed, the concurrent sentence doctrine would no longer apply.

**L.**    **Trial Counsel's Failure to Preserve Objections and Ineffective Assistance of Appellate Counsel – Grounds XXII and XXIV**

Lastly, in grounds XXIII and XXIV, Petitioner contends that trial counsel was ineffective for failure to "fully preserve the constitutional violations set forth in this petition" and that appellate counsel was ineffective for failing to raise the issues set forth in the petition on appeal. However, as described in detail above, the arguments set forth in the petition are meritless and do not entitle Petitioner to habeas relief. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Therefore, Petitioner is not entitled to relief on his remaining grounds XXIII and XXIV.

**IV.    Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude

48

the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### Conclusion

The Court will enter an order and judgment denying the § 2254 petition as well as a certificate of appealability.

Dated:   December 27, 2024                    /s/ Robert J. Jonker
                                              Robert J. Jonker
                                              United States District Judge